3190790, Girl Scouts of Central Illinois, Appellant v. Canton Park District, Appalachia. Ms. Lomaz, by the way, I want to apologize for our little glitch last week. But it's good to see you all again, so let's get started. Ms. Lomaz. Yes, Your Honor. I'm Bridgette Lomaz. I represent the Girl Scouts of Central Illinois, who are the appellants in this case. Can I say real quick that I don't think the lights are running? I think it was green before. There we go. Okay, so I'm going to start out with a few of the facts here. Mr. Ingersoll established a trust in 1949, and he amended and restated it 11 times thereafter. He's very generous and very charitable with the people of Canton, Illinois. He supports 17 different organizations with the income from this trust. And the qualifications for any of these organizations to receive the income is simply continuing existence. One of the beneficiaries is the Girl Scouts of Central Illinois. In 1959, all the Girl Scout leaders in Canton resigned, so there were no Girl Scout troops in Canton. Mr. Ingersoll knew of this situation pretty soon after it happened, yet he amended and restated his trust eight more times, and he always kept the Girl Scouts as a beneficiary. At the time of his death in 1973, there were still no Girl Scouts in Canton, so there was litigation regarding the question of who should get the income designated for the Girl Scouts of Canton, Illinois, when there were no Girl Scouts in Canton, Illinois. Today, however, there are Girl Scouts in Canton, Illinois. So when I think about this trust, I think about what Mr. Ingersoll was probably trying to do, and I think that he was envisioning a multifaceted and interesting and diverse community. He wanted to support people in all different walks of life and in all different stages of life. And this is best evidenced by the fact that he supported eight different churches. I highly doubt he was attending eight different churches. My guess is that he just wanted those to be available in the city so that there were places to go for anybody who came to the community. The other thing to keep in mind here is the perpetual nature of this trust. This trust is going to outlast any of us. The organizations who are beneficiaries of this trust are going to be affected by this decision 200 years from now, 500 years from now. So Mr. Ingersoll wanted to contribute to the community as a whole. He wanted to contribute to these 17 organizations, and he wanted his contribution to be able to move and shift between them to ensure an ongoing vibrant community. How do you know that? Like I said, I can't know that, but I can presume that from what he did, from the fact that he wanted to support these 17 organizations, eight of them being churches. I just doubt anybody's attending eight churches. I think that that's just what he must have wanted from this. He wanted to support Canton and lots of different things in Canton. The part where you said that he wanted them to shift between the various things, how do you know that? Yes, and I think from the language of the trust, that becomes clear. I think he either wanted to have a shifting executory interest or he wanted to have people vest each year once income was passed out. I think the language of the trust is clear that that's what he wanted to have happen. Can you point me in the direction of the specific language that you're relying on? Absolutely. Give me just a second. Okay. He wrote that payments provided for each of the organizations shall continue so long as such organization shall continue in existence. I go into really good detail in my brief about the word continue, but it basically has a dual meaning. It can mean something that just continues on forever without ever ceasing, or it can mean something that continues again, like on a sitcom, it will say to be continued and then you get to see the rest of the story arc the next week. It says shall continue so long as organizations shall continue in existence, and then it goes on to say that the Canton Park District shall receive 15% of the income and the portion of the income payable to any of the above organizations, which shall cease to be in existence at any time. It only sends the stream of income to Canton Park District at any time an organization ceases to exist. Where is the language that sends it back from the Canton Park District to one of those organizations if it comes back into being? My position would be that the way that he wrote the trust, the way he wrote that section A1 of his trust, that just becomes clear from the reading of that whole language. Okay. Thank you. Yes, Your Honor. So the trial court decided that Ray Giudicata bars this court's consideration of the merits of the case. Your consideration of that issue is de novo, and the burden is on Canton Park District that it doesn't, that Ray Giudicata bars this matter. We've also asked that the court grant the Girl Scouts motion for summary judgment, which is also considered de novo. Ray Giudicata doesn't apply for four different reasons. The first one is these are different issues. So the Campfire Girls Court construed the language Girl Scouts of Canton, Illinois. It considered who should receive the beneficial interest when no Girl Scouts actually existed in Canton. It paid special attention to the clause that talks about how Mr. Ingersoll didn't have the exact names of the organizations, but he wanted everything to go to the corporation commonly known by that name that's listed in the trust. Next, this court is asked to interpret that language that I just read to you. The trustee shall pay the balance of the annual net income to the certain organizations and payment shall continue so long as such organization shall continue in existence. And Canton Park District was to receive 15% of the income and the portion of the income payable to any of the above organizations which shall cease to be in existence at any time. This court is asked to consider whether an organization's right to the stream of income can be reestablished or continued if it exists after it has previously failed to exist. So even if this court were asked to consider the exact same issue, here we also have new facts. Ray Giudicata shouldn't apply because new facts have interceded between the Campfire Girls cases and the present case. This one's really simple. Back then there were no troops. Now there are troops. The Crystal Lake case explains that Ray Giudicata extends only to the facts as they were when the judgment was rendered. And that precedent goes back at least to 1933 by the case cited in my brief. This court doesn't need to rely on a 40-year-old finding a fact, especially when new facts are before the court that conflict with those facts. We have an affidavit by the CEO of the Girl Scouts of Central Illinois that explains how Girl Scout troops have come back into Canton. So the third reason that Ray Giudicata doesn't apply is that back in the day this matter was a non-justiciable issue. So it's true that Ray Giudicata bars not only what was actually decided in the first action, but whatever else could have been decided. This is an issue that couldn't have been decided. No one at that time said, well, Judge, what if the Girl Scouts come back into existence? Then what happens? It's really likely that had someone asked that question, the court would have relied on the doctrine of ripeness. They would have said that question's too abstract and it's premature. Those facts haven't arisen yet, so we can't possibly make a decision on that. If it had made any kind of decision on that or provided any answer, then it would have been dicta, and the stare decisis rule wouldn't have bound the court to its decision. Courts shouldn't make advisory opinions on facts that aren't before the court. The courts previously didn't make decisions that weren't before it. It stuck to the question that was before it at that time and the facts that were before it at that time. Even if all of the elements of Ray Giudicata existed, this court can refuse to apply it. Such a refusal is appropriate where fairness and justice require the court to consider the question before it. The purpose of judicial construction of a trust is to ascertain the intent of the settler and carry it out. Here, the Supreme Court decided that it was Mr. Ingersoll's intent to support the Girl Scouts, but the Supreme Court couldn't carry it out because there weren't any Girl Scouts at that time. Now, the facts make carrying out the intent not only possible, but the only fair and just choice. This brings justice to the Girl Scouts, to any other intended beneficiary of this trust whose existence may wax and wane over the course of perpetuity, and most importantly, this is justice for Mr. Ingersoll. So, the Supreme Court did decide that Mr. Ingersoll's intent was to benefit the Girl Scouts of Canton. Being as there were none at the time, it resorted to the gift over clause. That's the only reason Canton Park District received this stream of income. Now that Mr. Ingersoll's intended beneficiary for that 5% of the income does exist, should the trustee pay it to the intended beneficiary, or should it keep paying it to this placeholder? So, I always love a good sports analogy. If we were to assume that you're a baseball coach, and right before the season begins, your pitcher gets injured, and so you have to put in your second string pitcher. As soon as your starting pitcher heals, you're going to put him back in, and you're going to move that second string pitcher back to the bench. Canton Park District is just that placeholder for the intended beneficiary, Girl Scout Troops of Canton. It's Mr. Ingersoll's second string recipient. Now that the Girl Scouts are back, the stream of income should be paid to them. So, in his quest for supporting a diverse community, Mr. Ingersoll didn't seem to mind if an organization went out of existence from time to time. He still seemed to want to support it. This is evidenced by the fact that there were eight iterations of his trust, where he included the Girl Scouts of Canton as a beneficiary, even though at those times there was no Girl Scout Troops in Canton. He knew they didn't exist for roughly 14 years before his death, but he kept them as a beneficiary the entire time. He never makes a statement in the trust that if they haven't gotten their act together by my death, then their interest in the income is going to terminate. He leaves the time for continuing in existence open. So, Canton Park District's construction of the trust subverts the settler's intent. If we follow that draconian construction down to its logical path, any or all of these entities could momentarily fail to exist. And then, for the rest of all time, its share goes to the Canton Park District. That seems to be in direct conflict with Mr. Ingersoll's vision. Surely, he didn't want these institutions to fail. The loss of any of them would reduce the diverse offerings of the community, and refusing funding once they came back would make the comeback even more difficult. Canton would then end up as a town with a really well-funded park district, but it may not have much else. That certainly can't meet Mr. Ingersoll's vision. So, this trust only sends the stream of income to Canton Park District at any time an organization ceases to exist. After an organization has ceased to exist, it can exist again. Obviously, once an organization again exists, it continues in existence. And it has ceased ceasing to be in existence. Canton Park District only gets the income at any time an organization has ceased to be in existence. So, at times the organization exists, it would not be appropriate for Canton Park District to receive the portion of the income payable to that organization. At times its existence has continued, it meets the qualification to receive the trust income. So, this trust is just very cleverly and concisely creating this flexible scheme for meeting the settler's intent of providing for these 17 organizations that create this vibrant community in Canton. It also ensures that the trust doesn't hoard all that annual income and end up paying taxes on it, as the common law of the day would have required. This trust allows that second string recipient to take the income while the intended beneficiary gets its act together and comes back into existence. The stream of income goes to the intended recipient as soon as it continues in existence. So, in closing, re judicata doesn't apply to this situation. It's different issues than the first case. There are new facts that have interceded since the last case. The current issue that we're asking this court to consider wasn't justiciable during the last case. And even if all of those things didn't exist, justice still requires that this court consider the merits. If this court determines that if any entity that ceases to exist for some amount of time that its stream of income goes to Canton Park District in perpetuity, then Mr. Ingersoll's vision of benefiting Canton as a multifaceted community also ceases to exist. Or this court has the opportunity to carry out Mr. Ingersoll's intention by allowing all of these entities to get income at any time they exist and have Canton Park District as a placeholder when they don't. So we ask that this court reverse the trial court's ruling on re judicata and grant the Girl Scouts motion to dismiss motion for summary judgment and awarding the Girl Scouts the intended beneficiary, the stream of income that Mr. Ingersoll wanted it to have. Thank you. Thank you, Ms. Lopez. Any questions, Judge McKay, Justice Schmidt? Mr. Price. Thank you, Justice. Again, this is Dirk Price. I'm the attorney for the Atpelley, the Canton Park District, and may it please the court. Since we're talking about sports analogies, I'll go with one. As Yogi Berra said, it's deja vu all over again, and not because of Zoom. More than 40 years ago, the trustee, same trustee, sued in the Circuit Court of Cook County to get instructions for administering this exact same trust instrument because of a demand made by this exact same regional council of Girl Scouts. The Circuit Court of Cook County, after a trial, and after applying Cy Prey, construed the instrument one way. On appeal, the first district, after taking into account all the things in the trial, all the things that have been mentioned here by the regional council today, and all the things influencing Mr. Ingersoll, construed the trust a different way than the trial court. And then the Illinois Supreme Court disagreed with them both. And it entered a final judgment, construing the trust and setting forth the instructions that since 1983 have been followed by the trustee. The Illinois Supreme Court construed this trust instrument. All of this trust instrument. Do we really believe the Illinois Supreme Court doesn't know how to construe a document? Well, don't get me started, but when they dealt with this case before, there were no Girl Scouts at camp, correct? That's correct, sir. And had someone asked, well, what if the Girl Scouts come into existence in the future? Wouldn't the court have rightly said, well, then we'd have a different case? And the answer is found at page 513, Judge, because the Illinois Supreme Court said that the key here was that the settler had provided an alternative disposal upon the failure of the gift of the beneficiary. This is the one vesting issue that Illinois Supreme Court in construing this said there was one moment of vesting. That's over at page 516. They said the charitable beneficiaries of the trust would receive no income there from until after the death of the settler. In the event, the Girl Scout troops were organized in Canton before that event, the gift would not fail. In as much as this did not occur, and the group intended to be benefited by the gift did not exist when the gift was to become effective, the provision for the gift over to the Park District must take effect. It was mandatory language from the Supreme Court. And their conclusion was, we conclude that it was not the intent of Ingersoll that the share of his trust designated to be paid to the Girl Scouts of Canton be paid to the Council of Girl Scouts. They found a one moment of vesting. It was at that time of death. They use the word before and they use the word must give effect to the gift over. So that's the answer. They did consider timing. Okay, let me let me ask you about this is the appellant argues that those statements by the Supreme Court were dicta and that those comments weren't necessary to decide the case before. What do you say about that? It's the very syllogism they led up to. You start with 513 with them saying that the Supreme Court saying our primary concern is to construe the settler's intent. And then they say, we're unable to do that just from the language here in the trust instrument itself. So we're going to look at all this other evidence. They outlined from 514 through 515 what they're going to look at which leads them to say the scheme of Ingersoll's philanthropy was clearly to benefit the residents of Canton and Fulton County. We will therefore construe his gift in this way, conform to this scheme. Then they apply the facts before them right there in 516 leading to this syllogism. A syllogism that applies the very facts of the case to the principles they've announced leading to a conclusion is not dicta. Help me out about something. Wasn't the issue before the court whether the campfire girls of the Park District got the money, the 5%? Not the campfire girls, they were gone. This was about the regional council, the Kickapoo Council of Girl Scouts. That was the question, whether it was going to be. But the larger question before them, Justice Schmidt, was the entire trust instrument. What was the effect of the gift over clause? And they said it's in existence at the time of death, plus continuing in existence. The way the appellant wants you to read this is that they be in existence. That's not what he said. He said at the time of his death, plus continuity. Continuous is used three times in the gift over language. That's not the same as being in existence. OK, what do we make of the fact that when when he wrote this trust and amended it, or at least when he amended it a number of times, the Girl Scouts of Canton were not in existence. We make of it what the Illinois Supreme Court said we make of it, that the gift failed and the gift over clause must be given effect. We don't have to go back to reinterpreting the trust. The Illinois Supreme Court answered that question for you. They said the gift fails. We must give effect to the gift over clause. That's the vesting moment. And that's the difference between this and that Crystal Lake case. In Crystal Lake, he created a 20 year window for somebody to try and vest that gift. It was a race to vested. It never vested until either somebody won the prize or the 20 years expired. That's not this case. This moment of vesting happened at his death. So say at the Illinois Supreme Court. And that vested then. And because the Girl Scouts gift failed, the best thing of all those other interests is that the gift over clause had to apply. Because it applies to the others. The gift they got has this clause in it. If they cease to exist, it now goes to the Park District. If he had wanted something that was in and out of vesting, that would have been a unprecedented. Second would have been contrary to the Illinois Trust and Beneficiaries Act, which we cited in our brief, which provides for one moment of vesting. And then how you deal with the subsequent beneficiaries or where the income goes when it's terminated. When an interest that's given in an income stream like this is terminated for whatever reason, the act kicks in to tell you how to do it. This in and out, back and forth, coming in and out of existence. Not only is that super expensive. So we're paying a trustee and not benefiting the people of Canton, but it's contrary to the statute. Most importantly, though, for race judicata purposes here, it's contrary to what the Illinois Supreme Court already ruled. They've already answered that question. They said vesting occurred at the time of death. Sorry, you weren't here. You're out. The circuit court got this right when he says the Illinois Supreme Court effectively discontinued any potential claim. The Girl Scouts of Canton, Illinois, for any of its privies or successors may ever have. In essence, the Campfire Girls decision eliminated the Girl Scouts of Canton, Illinois, as a beneficiary of the Ingersoll trial. That's exactly what the Illinois Supreme Court did in interpreting this very same instrument. It's the instrument that's at issue, not particular clause, all of it. And so when they vested it in one person in one moment, it's death plus continuity. That's what we need to recognize. And there are no new facts about that moment at Mr. Ingersoll's death. There aren't any new facts about that. The facts are some 40 years later. There's no doubt that it was a final judgment. That's a part of the race judicata. And it was final. And for 40 years, it gave the instructions that needed to be here. The heart of the opinion is that syllogism we referred to at 516. It's a conclusion. They say it so much. And again, throughout, there is no when versus who. The when informs the who, because that's the critical point. When are we talking about? And the Illinois Supreme Court concluded the critical moment about who is involved is at that moment of Mr. Ingersoll's death. And because there was this gift over clause, because there was an alternative provided for disposal in the event of something failing, that had to be given effect. One of the things that the appellant says is it's only fair and just to do Mr. Ingersoll's intent. And that's why we have the Girl Scouts. But Mr. Ingersoll's intent was in the gift over clause that it go to the Park District. Why is the Park District most favored? And why is it not justice to give effect to that? The Park District's most favored because its mission most overlaps with all the others. In terms of the quality of life for the people in Canton, in terms of their group activities, their recreational activities, their health and mental well-being. That's the mission of the Park District. That's why it's most favored. And that's why it gets the stuff when the other entities that he favored go out of existence. Because that mission will endure. It's a unit of government. So what's fair and just is to give effect to the intent of Mr. Ingersoll, which the Illinois Supreme Court, the highest court that will ever consider this trust instrument, already told us means that the gift over must be given effect. So it's just one thing. I mean, the Park District would continue to endure without the extra 5%, right? Not in its present state. Part of the mission of the Park District is to use all of its resources and to steward tax dollars. So if you take 5%, it's going to have to do something different, whether that means additional taxes, but it won't be able to keep the same level of service. Let me ask you, and this isn't, I'll grant you, not a relevant question, but I've got an inquiring mind. So how much money are we talking about? Well, that goes from year to year. That might be a question for the trustee who's available to speak. What the most recent amount is. Okay. All right. Fair enough. So again, the Regional Council has never dealt with the Trust and Beneficiaries Act. And again, when it comes to the intent of Mr. Ingersoll, we cannot forget the gifting over clause. We talked about the Crystal Lake in my time here. And again, to use the pitching analogy, this is like saying that in the Crystal Lake case, because Chris Sayle didn't make it to the World Series with the White Sox, then he got acquired by a different team and got to the World Series with the Red Sox and won it. That would be unjust. Well, that's what happened in Crystal Lake. The first time they tried to get the gift and win it, they didn't qualify, but then they got acquired by a different team and were able to qualify. That was the key difference there. But there was only one vesting, not an in and out of vesting like is being proposed here. In fact, this is unprecedented. There aren't cases about in and out of vesting. This is kind of like a reverter clause. And when you have a reverter clause on your title, you take it subject to that. Every one of these beneficiaries took subject to being in existence and continuing in existence. And when that stopped, the money reverted to the Park District. There's no coming back from it. Again, it doesn't say be in existence. It says continue. It says continue three times. So the only fair and just thing there is to give effect to the gift over clause. Quickly, a moment about the summary judgment that's asked for. If you'll recall in the history of this case, there was a trial required to get to it. And so if for some reason you don't believe the Illinois Supreme Court actually construed the whole trust, and that did something less than that and provide instructions, and you're going to ignore the words before that event, which is in their opinion, the gift would not fail and that you're going to ignore their direction to give effect to the gift over clause, then we're not ready for summary judgment. Because this whole business about what does it mean to be in existence is a ceasing to cease. Existing was how I believe it was put. That's going to require a record of facts on which to draw. Is one person who wears a badge and claims to be a Girl Scout sufficient? Or is it what constitutes a true? I don't think we ever have to get there. The Illinois Supreme Court said this is how this instrument is to be dealt with. The Girl Scouts are out. All the monies to go that were supposed to go to the Girl Scouts goes to the parties. And for the reasons that they said for. So we're identical on the issue, the intent as construed in this instrument. We're identical on the parties and we have a final judgment. That's race judicata. We ask that you affirm the circuit court's opinion. Thank you. Thank you, Mr. Price. Yes, Your Honor. Again, the light isn't on. Can I go ahead and start? There it goes. Okay. Okay. So the Campfire Girl Courts construed only as to the question that was before it. At that time, they were looking to see who should get this money when no Girl Scouts exist. So at that time, they had the Campfire Girls who did similar scouting type activities. They had the Kickapoo Council of Girl Scouts, which would be the overarching group that would be over any Girl Scout troops actually in Canton, if there actually were any. Or the Canton Park District as the gift over. So Kickapoo Council is different than we are today. And the difference is that now there are Girl Scout troops in Canton. And this can be read to be similar to some of the other beneficiaries of the trust. For example, one of them is to the Salvation Army, Canton, Illinois, 5% for use only in Canton and Fulton County, Illinois. That's paragraph O of section A1. I think there are a couple others that do that same kind of thing. So if you've got something going on in Canton, you can have the money. If you've got nothing going on in Canton, then we're not just going to give it to the big overarching group. That's all consistent with what the trust says and what the prior courts did. We keep talking about this dicta on page 516. This isn't mandatory language. The classic definition of dicta is a by the way comment that originates with that judge and it's used to illustrate his point. The Supreme Court justices weren't considering what might happen if Girl Scouts continue their existence at some point in the future. They didn't investigate that question at all. There's no indication in the opinion that that factual scenario even crossed their minds as they wrote this opinion. It's so clearly dicta that the opinion literally puts forth the fictional scenario as an if-then statement. In the event that Girl Scout troops were again organized before his death, then the gift over would not fail. This is an illustration to explain the court's reasoning in the case that it was considering. It's not a blanket statement that Girl Scouts can never exist again. And also, I went over this pretty heavily already, but it was a non-justiciable issue back then. Whether Girl Scouts come back into existence wasn't something that court would have been able to consider. We've also talked a bit about the word after. So if we just use the plain and ordinary meaning of the word after, it's not a moment. After is a continuum of time after a moment. Here it says after the death of the donor. After, by its plain meaning, can't mean the exact moment that Mr. Ingersoll took his last breath. This trust itself uses various sections where it does talk about his moment of death. At one point it says immediately upon the death of the donor. At some points it uses these types of words that really tell you that's what he means. This one says after his death. Also, this isn't a window of time like Crystal Lake. This leaves the door wide open. It says after my death, continuing to exist. So it's just all time after he dies. We're not limited to those 20 years. We talked a little bit about the Principle and Income Act. So it says an income beneficiary is entitled to income from the date or event specified in the instrument. Or if none is specified from the date an asset becomes subject to the trust. Here there is no specific date or event. It's just after Mr. Ingersoll's death. So we go to the second part of that clause and figure out when the asset becomes subject to the trust. At Section A-1 it says the trustee shall pay the balance of the annual net income of the trust estate. The annual net income is established annually. So it follows that each beneficiary fails or vests annually. They want to take Section C of that section and apply it to this situation. But it just doesn't apply because it begins on the termination of an income interest. Here the trust doesn't create any termination of an income interest. So any argument based on that just becomes circular reasoning. He mentions that it would cost too much to do that on this trust to look at it every year. But there's no indication in this trust that Mr. Ingersoll wanted it to be cheap. We're already paying a trustee. Why not pay them to check and see if people exist before they pay money to them? That seems to comport exactly with this trust. And finally, your consideration of the mission of the Park District and all the stuff it does really isn't relevant to your consideration of construing this trust. Thank you. Thank you both for your arguments again today. We will take this matter under advisement. But I do want to ask Mr. Brittenstine if he has anything to add today. Thank you, Your Honor. Well, I just wanted to respond to the question that Justice Schmidt posed or attempt to respond. You asked, Your Honor, about the approximate value of this interest. And I've been sitting here at my computer during the argument trying to pull that up. What I found is not perfect, but just to give you a ballpark, I found a 2015 statement. So it's a few years ago. And a 5% interest at that point, which is what we're talking about here. I'm looking at the second quarter of the year, and that was running at about $24,000. So if you figure that's a quarter of the year, the ballpark would be about $100,000 a year at that time. I doubt it's hugely different now. I don't have a 2020 number. But just to give you a ballpark sense, which is what I understand Your Honor was interested in. Thank you. Of course. Thank you, Mr. Briggs. Again, thank you all. Thank you, Senator Feinman. Get back to you with a written decision within a short time.